UNITED STATES of America, Appellee,

v.

Michael CLEMENTE, Tino Fiumara, Thomas Buzzanca, Vincent Colucci, Carol Gardner, Michael Copolla and Gerald Swanton, Defendants-Appellants.

Nos. 549 to 553, Dockets 80–1261, 80–1263, 80–1271, 80–1273 and 80–1275.

United States Court of Appeals,
Second Circuit.

Argued Nov. 5, 1980.

Decided Feb. 26, 1981.

Rehearing Denied April 14, 1981.

---

Alan M. Dershowitz, Cambridge, Mass. (Nathan Dershowitz, Jeanne Baker, David Fine, Cambridge, Mass., of counsel, Richard Strafter, Holly Skolnick, John Batter, Joann Crispi, Cambridge, Mass., on the brief), for defendant-appellant Clemente.

Carl M. Bornstein, New York City (Barry A. Bohrer, New York City, of counsel), for defendant-appellant Colucci.

Herbert O. Reid, Sr., Howard University School of Law, Washington, D.C. (William A. Borders, Jr., Washington, D.C., of counsel), for defendant-appellant Gardner.

Irving Anolik, New York City, for defendants-appellants Buzzanca, Fiumara and Copolla.

Maurice M. McDermott, New York City (Paul R. Grand, Norman L. Ostrow, Grand & Ostrow, New York City, of counsel), for defendant-appellant Swanton.

Michael S. Devorkin, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty., for the Southern District of New York, Daniel H. Bookin, Ruth N. Glushien, Mary Jo White, Asst. U.S. Attys., New York City, of counsel), for the United States of America.

Before FEINBERG, Chief Judge, and FRIENDLY and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This case concerns racketeering activity that has plagued waterfront businesses in New York and New Jersey. Judgments of conviction were entered in the United States District Court for the Southern District of New York after a twelve-week jury trial before Judge Sand. The indictment contained 213 counts, charging the defendants with engaging in extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1976); receiving bribes in violation of the Taft-Hartley Act, 29 U.S.C. § 186(b) (1976); conducting and conspiring to conduct an enterprise's affairs through a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d) (1976); evading taxes and filing false tax returns in violation of 26 U.S.C. §§ 7201 and 7206(1) (1976); and making false declarations before a grand jury in violation of 18 U.S.C. § 1623 (1976). A schedule listing the defendants' various convictions and the sentences imposed appears in the appendix.

## BACKGROUND

The evidence offered by the government at trial depicted Michael Clemente as the ringleader of a highly organized enterprise that had infiltrated all aspects of waterfront business, including labor, shipping, and ship-servicing. Clemente's specific area of control was identified as the New York waterfront. The evidence described the other defendants as follows: Fiumara acted as the New Jersey waterfront "boss" but was subordinate to Clemente; Copolla was a personal assistant to Fiumara; Gardner and Colucci were presidents of two New Jersey International Longshoremen's Association (ILA) locals and answered directly to Fiumara in connection with their illicit

activities; Buzzanca was president of two New York ILA locals and conducted his activities under the supervision of Fiumara; and Swanton, a vice-president of a shipping company in New York, worked closely with Clemente.

The linchpin of the enterprise was its control of the ILA in New York and New Jersey; with this power it was able to extort monies from shipping companies and influence their decisions regarding the allocation of ship-servicing contracts. The latter influence empowered the enterprise to extort monies from the companies that provided services such as the lashing and carpentry work required in connection with loading and unloading cargo. Only those shipping companies and ship-servicing companies that paid the amounts demanded by the enterprise, or "did the right thing" in the argot of the waterfront, had their ships' cargo loaded and unloaded without interruption or obtained and retained contracts to provide their services. The evidence adduced at trial largely concerned dealings between each of the defendants and the government's principal witness, William Montella, who was employed by several ship-servicing companies during the indictment years.

### The Court-Authorized Surveillance

Between August 1977 and March 1978 the government monitored oral conversations through listening devices installed in Montella's offices, which had been authorized by court order pursuant to 18 U.S.C. §§ 2510–2520 (1976).[1] The intercepted conversations combined with physical surveillance of Montella provided the government with substantial proof of Montella's pattern of monthly deliveries of cash to the defend-

ants Clemente and Buzzanca.[2] Montella was approached by the government in May 1978 and agreed to cooperate in June of that year.[3] From June through December 1978 Montella met with several of the defendants and successfully recorded sixteen of their meetings.[4]

Additionally, several consensual recordings made in the course of an independent New Jersey state investigation were admitted into evidence. In one conversation Fiumara promised a New Jersey undercover officer certain waterfront business and, in another, Copolla described Fiumara's waterfront control and Copolla's own role as Fiumara's assistant.

### The Netumar Account

From 1970 to 1972 New Jersey Export Co. (N. J. Export) served as the carpentry contractor for Netumar Steamship Line (Netumar), which operated from Pier 36 in Manhattan. At that time, Montella was the general foreman for N. J. Export. Montella testified that beginning in 1970 or 1971 defendant Swanton, then a vice-president of Netumar, threatened that unless Montella agreed to "do the right thing" Swanton would "throw them out" and find another company that would make the payoffs demanded. Swanton informed Montella that he was associated with Clemente, who was the behind-the-scenes boss who ran the East River Piers in Manhattan, and that some of the kickback money would be given to Clemente. When Montella asked Swanton how he was expected to raise the cash to make the payoffs, Swanton instructed him to inflate his materials bills. Montella agreed to make the payoffs and admitted that he later kept some of the money generated in this manner for himself.

1. Six extension orders were issued to continue the surveillance. *See* 18 U.S.C. § 2518(5) (1976).

2. Court-authorized listening devices were also planted in Buzzanca's offices between March 1978 and June 1979. Conversations concerning arrangements of meetings between the various defendants and discussions about the extortion of waterfront companies were intercepted.

3. Montella agreed to plead guilty to two five-year felonies of conspiracy and one five-year felony for tax evasion.

4. During these meetings Montella used government funds to pay Clemente $7,000, Fiumara $4,000, Buzzanca $13,000, and Gardner $1,000.

When Montella left N. J. Export to join a Brooklyn-based company, C.C. Lumber Co., he asked Swanton whether his new employer could obtain the Netumar account. Swanton denied the request, asserting as his reason Clemente's dislike for Anthony Scotto, the Brooklyn ILA local president.

In June 1973 Montella left C.C. Lumber and joined Quin Lumber, another Brooklyn-based carpentry and lashing company. Quin Lumber's employees, like those of C.C. Lumber Co., belonged to the ILA Brooklyn local run by Anthony Scotto. In early 1974 Swanton called Montella and advised him that Clemente had resolved his differences with Scotto and that, therefore, Montella's Brooklyn employer could now obtain the Netumar account. Thereafter, they arranged a meeting where Swanton told him: "Listen ... go to the Shelton Health Club. Ask for Mike C. Give him 500. Give him 500 a month.... Give him 500 and make him happy." Montella testified that shortly thereafter he met Clemente at the Shelton Health Club, where the following exchange took place:

> MONTELLA: Mike, I'm Sonny [Montella]. Gerry [Swanton] told me to come down. I'm with Quin Lumber and I'm going to be doing the carpentry work down there.
>
> CLEMENTE: I hope you do the right thing. I hope you are not cheap.
>
> MONTELLA: I'm going to give you 500 a month.
>
> CLEMENTE: Okay. If you have any problems down there ... let me know. Go out and make money.

Montella testified that some time in April or May 1974 he returned to the Shelton Health Club and handed Clemente $500 in cash in a white envelope. Thereafter, Montella delivered $500 in the same manner once a month through December 1976. Montella testified that he continued to make the payments because he feared that if he stopped he would lose the Netumar account.

In 1976 Montella placed a bid with Netumar for the contract to perform the lashing work in addition to the carpentry services his company already was providing. When Montella's bid was rejected, he approached Clemente for assistance. Clemente gave Montella instructions; Montella followed them and was subsequently awarded the lashing contract with Netumar. Later, Clemente asked for another $500 per month and Montella acquiesced. Thereafter, from January 1977 through December 1978 Montella paid Clemente $1,000 in cash at their monthly meetings at the Shelton Health Club.

During the same period in which Clemente was receiving payoffs from Montella, he had also arranged to receive $200,000 per year from Netumar itself. When Netumar began its operations at Pier 36 in Manhattan, it believed that it was being grossly overcharged by its stevedore, United Terminals, Inc. (United). Charles Mattmann, Netumar's president, approached officials of United and attempted to negotiate a reduction of the $800,000 annual equipment rental fee it was paying or to buy the equipment outright. United offered to sell the equipment for $1 million, a price considered excessive by Mattmann. Mattmann then approached Clemente for assistance. Clemente offered to intervene provided that Mattmann agreed to pay him 25 cents for each dollar Clemente saved Netumar. Following Clemente's intervention United sold the equipment for $300,000. Thereafter Netumar paid Clemente $200,000 in quarterly cash installments each year. Netumar made these payments from 1973 through 1978 in restaurants in Brooklyn and Manhattan.

*The Concordia Line Account*

In June 1975 another shipping company, the Concordia Line, decided to move its operation from Hoboken, New Jersey, to Newark. Castelo and Sons Ship Servicing Co., which had been providing the lashing work for Concordia in Hoboken about this time, was approached by defendant Carol Gardner, the president of the black ILA local in Newark. Gardner advised Manuel Castelo and Joseph Castelo, Jr. that they

would have to pay him certain amounts of money to retain the Concordia account once it moved to Newark. The Castelos, who were friends of Montella, informed him about Gardner's demands.

Montella subsequently contacted Gardner and inquired about the Concordia Line account. Gardner told Montella to meet him and his "partner," defendant Vincent Colucci, in Miami to discuss the matter. Colucci was then president of the white ILA local in Newark. Montella met with Gardner in Miami but did not reach a final agreement. They continued their discussions in New York, where Montella ultimately agreed to pay Gardner and Colucci $10,000 cash up front and $2,000 cash each month for the Concordia Line account. Montella also agreed to pay secretly to Gardner an additional $10,000 cash and promised not to disclose this clandestine payment to anyone, including Colucci. In August 1975 Montella met with Gardner and handed him $20,000 in cash. In September 1975 Montella was advised by a Concordia Line official what rates to bid and shortly thereafter was awarded the contract.

Although it had been agreed that Gardner and Colucci would share Montella's $2,000 monthly payoffs, Montella soon began to receive separate demands for the money from each of them. Each month Montella paid Gardner but, nevertheless, received an additional demand from Colucci. Montella arranged a meeting among the three of them to attempt to straighten out the problem, but the meeting achieved less than satisfactory results.

Afraid that he would continue to be "double-banged," as he later termed it, by Gardner and Colucci, Montella arranged a meeting with Clemente to seek his assistance. Montella met with Clemente at the Shelton Health Club in December 1975 and explained the situation to him. Clemente informed Montella that had he approached him initially he could have avoided paying

any money to Colucci and Gardner. Clemente admonished Montella, however, that "[n]ow you made a commitment you got to live up to it." Although Clemente insisted that Montella live up to his "commitment," he advised him to see the defendant Buzzanca and "tell him you are with me and tell him the story." .

Subsequently, Montella adventitiously met Clemente and Buzzanca at a restaurant in Manhattan. Clemente introduced Montella to Buzzanca and requested that he recount his story to Buzzanca. Buzzanca apologized to Clemente for the trouble that Montella had experienced and promised to clear up the problem. Buzzanca told Montella to make the monthly payments directly to him in the future. When Gardner and Colucci next called him, Montella informed them that he had been instructed not to make his monthly payoffs to them any longer and that they would be receiving instructions as well. Montella did not again hear from Gardner or Colucci in connection with this matter.

Montella complied with Buzzanca's directions and paid him $2,000 cash at Buzzanca's office. The first payment was made in the presence of defendant Fiumara, whom Buzzanca had asked to listen to another rendition of Montella's Concordia story. Montella continued to deliver the $2,000 cash payments to Buzzanca at his office or in the men's room of a New York restaurant.[5] Montella testified that the payments he made to Buzzanca were handed over to Buzzanca's boss, defendant Fiumara. The payments continued through December 1978 when Fiumara himself picked up a $2,000 payment.

### The Chilean Line Account

In 1975, during the same period in which Gardner and Colucci succeeded in coercing Montella to pay $2,000 per month for the Concordia Line account, they advised Montella that unless he paid them an additional $2,000 per month he would lose his account

---

5. On several occasions Fiumara's assistant, Copolla, came by Montella's offices and picked up the payoff money. On one occasion Laurence Ricci, another assistant to Fiumara, picked up a payment at Montella's offices.

with the Chilean Line. Montella protested that he had obtained the Chilean account many years before in Brooklyn, and that it would be unfair to demand cash from him to retain it. Gardner replied, "Wrong, that's my account," and advised Montella that to retain the account he had to pay the amount they were demanding. Montella testified that the following dialogue ensued:

MONTELLA: I got to get out? Just like that I got to get out?

GARDNER: That's it.

COLUCCI: That's it.

MONTELLA: First I buy the Concordia Line and now all of a sudden I am getting thrown out of the Chilean Line.

GARDNER & COLUCCI: That's what the boss said, the boss wants you out.

MONTELLA: The boss, who is the boss? I thought you were the boss.

GARDNER: You don't know who the boss is?

MONTELLA: No.

GARDNER: T is the boss.

Montella testified that "T" was the defendant, Tino Fiumara. Montella subsequently advised the vice-president of the Chilean Line that he would no longer "do his vessels in the Port of New Jersey . . . because it was just a little too expensive . . . to do his business."

*Clemente and Fiumara—The Bosses of the Enterprise*

The government introduced tape recordings of conversations in which several of the defendants professed their loyalty to defendant Fiumara and recognized his authority over them. Buzzanca, for example, stated on one occasion:

Tino's good point is that everybody fears and respects him. That's a good thing. . . .

\* \* \* \* \* \*

I love Tino and I would do anything in the world . . . .

\* \* \* \* \* \*

I love him. I love him. And I got to. Ya know like, and I live with him every-day. I absolutely think, if this guy tempers himself, he'll be, ten years from now, he'll be awesome. . . . He'll have the best of two worlds. Good sense, good judgment. Plus, which we all live under fear. Ya need to have that balance . . . . [W]e'll make money. We'll steal it, if we have to.

\* \* \* \* \* \*

Somehow I get in fact, I notice in Tino and more than Mike. I come from the greatest guy in the world.

On another occasion, the following statement was made by defendant Gardner concerning defendant Fiumara:

I don't make no move until I, you know, check with, I do the right . . . . I don't have the last decision.

I say I'm very loyal to this guy.

Additionally, the government offered evidence of numerous instances in which Fiumara coordinated activities and meetings among Copolla, Buzzanca, Colucci, and Gardner.

Fiumara's authority on the waterfront, however, was not supreme. The government introduced a great deal of evidence demonstrating that Fiumara was subordinate to Clemente. For example, Clemente's handling of Montella's problems with Gardner and Colucci, who answered directly to Fiumara, demonstrated Clemente's power to control Fiumara's subordinates, and thus Fiumara. Additionally, in 1978 Clemente was able to arrange increased business for Montella on the New Jersey waterfront, Fiumara's territory, illustrating Clemente's commanding position in the enterprise. After Fiumara acceded to Clemente's request that Montella be given more business, Clemente boasted that "Tino give me some satisfaction." Finally, Clemente took steps to protect the enterprise from investigations, evincing his patriarchal role. For example, the government introduced evidence that Clemente obtained a secret New York Waterfront Commission document containing information about federal electronic surveillance of Montella, Buzzanca, Gardner, Colucci, and others.

*The Defendants' Case*

Of the defendants, only Gardner and Swanton testified. Gardner denied all of the allegations that had been asserted against him and stated that he was the victim of a racially motivated conspiracy by the government against blacks. Swanton also contested the charges brought against him and testified that, contrary to his own previous grand jury testimony, he had not possessed the power to choose the carpentry and lashing contractors for Netumar. He testified that he did not believe that Clemente had any influence on Pier 36 in Manhattan.

## I.

*The Hobbs Act Counts*

Defendant Clemente asserts that his convictions for extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951 (1976), require reversal because the district court's charge was incorrect and because, in any event, insufficient evidence was introduced to sustain them. We conclude that both of these arguments are meritless.

Section 1951 provides in pertinent part:
    Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do . . . shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"Extortion" is defined in the Hobbs Act as the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(b)(2). Clemente's principal contention with respect to the court's charge on the extortion counts is that the trial court improperly charged the jury on the element of wrongfulness.

Extortion, as defined in the Hobbs Act, consists of the use of wrongful means to achieve a wrongful objective. *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). The Supreme Court's decision in *Enmons* teaches that the applicability of the Hobbs Act to cases such as the one before us depends on whether the statutorily identified means ("actual or threatened force, violence, or fear") have been put to "wrongful use", *i. e.*, have been employed to obtain property to which "the alleged extortionist has no lawful claim." *United States v. Enmons, supra*, 410 U.S. at 400, 93 S.Ct. at 1010.[6]

The trial court charged the jury on the elements of extortion as follows:

First, what is an "extortion"?

The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force or fear.

\*   \*   \*   \*   \*   \*

Now, we have said that the word "extortion" means the obtaining of property from another, with his consent induced by the wrongful use of actual or threatened force or fear. In this case, the government contends that property was obtained through threats and fear of economic loss.

\*   \*   \*   \*   \*   \*

In the context of the statute with which we are concerned, . . . fear means that the alleged victim of the charged extortion feared possible financial injury caused by interference with the right to solicit and obtain business or with the right to retain work.

\*   \*   \*   \*   \*   \*

Let me explain to you how the word "wrongful" applies to your consideration of these counts.

---

**6.** In *Enmons*, the Court held that the Hobbs Act has no application to cases involving "the use of violence to achieve legitimate union objectives." 410 U.S. at 400, 93 S.Ct. at 1010. Specifically, the Court declared that where the objective is higher wages in return for "genuine" services, the Hobbs Act is inapplicable, notwithstanding that violence has been used to exact such higher wages. The Court emphasized, however, that cases involving the use of the statutorily proscribed means to obtain "imposed, unwanted, superfluous and fictitious services" do come within the purview of the Hobbs Act.

"Wrongful" means that in order for you to find that any of the acts of extortion alleged in these counts were, in fact, committed, you must find beyond a reasonable doubt that the defendant or defendants you are considering had no lawful right to the property obtained, and that the property was obtained because of the victim's fear of economic loss.

\* \* \* \* \* \*

If you find that threats were made or that fear was reasonably aroused, and if you find that the purpose of the defendant you are considering was to obtain money for himself or others to which they were not entitled, then I instruct you that the element of wrongfulness has been established.

Clemente insists that, in view of the court's charge, the jury could have convicted him solely upon finding that he used fear of economic loss to obtain money from Montella. He contends that the use of fear of economic loss is not inherently wrongful, but rather represents a device routinely used in legitimate business transactions, and claims that merely using fear of economic loss to obtain money does not render the receipt of such money wrongful. Thus, he asserts that the requirement set forth by the Supreme Court in *Enmons*, that both the "means" and the "objective" be wrongful to constitute extortion within the meaning of the Hobbs Act, *see* 410 U.S. at 400, 93 S.Ct. at 1010, was not adequately conveyed to the jury by the district court's charge.

We are satisfied that the charge correctly instructed the jury on the wrongfulness element of the crime of extortion. The thrust of the district court's charge when read as a whole, *see Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–401, 38 L.Ed.2d 368 (1973), was that the use of fear of economic loss to obtain property to which one is not entitled is wrongful. It is obvious that the use of fear of financial injury is not inherently wrongful. And precisely because of this fact, the "objective" of the party employing fear of economic loss will have a bearing on the lawfulness of its use.

In this regard, Judge Sand instructed the jury that the wrongfulness element of the crime would be satisfied upon finding that fear of economic loss was employed by the defendants to obtain money to which they were not lawfully entitled.

Defendant Clemente interprets *Enmons* as limiting the scope of the Hobbs Act to embrace only those cases in which the means and the objective of the alleged extortionist, when viewed *apart* from each other are each wrongful. While this interpretation of the Hobbs Act may be applicable to cases concerning union demands for higher wages, at least one Circuit has questioned whether the Supreme Court's decision in *Enmons* requires that the statute be so strictly construed in other contexts. *See United States v. Cerilli*, 603 F.2d 415, 420 (3d Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 1728 (1980). In *Cerilli*, a case involving lessors of road maintenance machinery who were forced to make political contributions to obtain contracts with a municipality, the Third Circuit determined that the "manner" in which the property is obtained has a bearing on whether the objective, "obtaining the property from another," is legitimate. In other words, the Third Circuit declined to evaluate the "objective" of the defendants in a vacuum, independent of the conduct involved.

The converse situation exists in this case. Fear of economic loss is not an inherently wrongful means; however, when employed to achieve a wrongful purpose, its "use" is wrongful.

Nor do we agree with Clemente that the court's charge on extortion was improper because it would embrace a broad spectrum of legitimate business transactions. Judge Sand specifically instructed the jury that the Hobbs Act

does not prohibit any person from using his position of power or influence to obtain legitimate economic ends. The obtaining of money by one who is functioning as a salesman or a broker for the successful solicitation or referral of business, or for use of his influence, good will,

or advice, does not in and of itself constitute extortion unless you find that the payment of such monies was induced by wrongful threat or fear of economic loss. This instruction insured that the jury would distinguish the influence peddler who is lawfully entitled to receive compensation for his legitimate services from persons such as Clemente who exact tribute from their victims in exchange for agreements either to exercise or refrain from exercising the corrupt influence they have acquired.

We conclude, therefore, that the charge was legally sufficient. *See generally United States v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *United States v. Tolub*, 309 F.2d 286 (2d Cir. 1962).

■ Clemente also attacks the sufficiency of the evidence admitted against him in connection with the Hobbs Act violations. The verdict of a jury must be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *accord, Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974). We are satisfied that the government introduced ample proof to demonstrate convincingly that Clemente had no lawful claim to the monies he obtained from Montella. The government established that Clemente's influence with Netumar depended upon his power to call for work stoppages unrelated to any bona fide labor dispute and his willingness to exercise that power for his own personal benefit. Moreover, the circumstances surrounding the actual payoffs, such as the clandestine meetings in secluded areas arranged by Clemente to conduct those transactions, clearly reflect their illicit nature.

Montella testified that Clemente made numerous statements during those meetings concerning his power over the waterfront industry. Clemente explained how the enterprise functioned and told Montella which ILA officials were under his control. Clemente boasted, for example, that he had had great influence in the appointment of Fred Feld as General Organizer of the ILA and that he was grooming Scotto to be Feld's successor. Montella testified that Clemente's statements to him convinced him that Clemente was the power behind the Manhattan piers and that, therefore, he could easily take the Netumar account away from him if he chose to do so. Moreover, other proof of Clemente's guilty state of mind was introduced at trial. For example, when Clemente learned of a pending waterfront investigation, he admonished Montella never to use his name on the telephone and not to arouse suspicion. On another occasion, Clemente advised Montella that he knew that certain ILA officials would be indicted for extortion and tax evasion; Clemente went so far as to arrange a meeting with Montella and Anthony Scotto to discuss the threat the waterfront investigation was posing to their conspiracy. Finally, in June 1978 Clemente advised Montella that if anyone, including Scotto, betrayed him, "His life won't be worth two cents. In twenty-four hours he'll be gone."

Here, the defendants used fear of economic loss to obtain money to which they had no lawful claim. Notwithstanding defendant Clemente's argument to the contrary, it is clear that a wrongful purpose, obtaining money to which they had no lawful claim, was the aim of the defendants. Thus, the utilization of fear of economic loss to achieve that goal was wrongful. This being the case, the wrongful means and wrongful use elements of the crime of extortion were met.

*Swanton's Aiding and Abetting Convictions*

Defendant Swanton was convicted on 56 counts of aiding and abetting Clemente's extortion of payoff money from Montella between April 1974 and December 1978. Swanton contends that the district court's charge concerning these counts was improper. Additionally, Swanton attacks the sufficiency of the evidence. We conclude that neither of these challenges has any merit.

■ To aid and abet the commission of a crime, a defendant must "in some sort asso-

ciate himself with the venture, . . . participate in it as something that he wishes to bring about, [and] seek by his action to make it succeed." *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938); *see generally Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766 (1949); *United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir. 1977); *United States v. Mariani,* 539 F.2d 915, 919 (2d Cir. 1976); *United States v. Garguilo,* 310 F.2d 249, 252–53 (2d Cir. 1962).

■ Paraphrasing Judge Learned Hand's language in *Peoni,* the district court charged the jury:

First, as you no doubt recall from my previous remarks, in order to find that a defendant was an aider and abettor, you must find beyond a reasonable doubt that he had an interest in the crime charged, that is, that he in some way knowingly associated himself with the criminal act alleged, that he participated in it as something he wished to bring about, that he sought by his action to make it succeed.

In your deliberations as to whether Mr. Swanton aided and abetted in these counts, you must consider whether the evidence demonstrates beyond a reasonable doubt that he participated in it as something that he wished to bring about, *that he sought by his action to make it succeed with respect to each payment alleged in each count*—the $500 a month payments from April 1974 through December 1976, and the $1,000 a month payments from January 1977 through December 1978.

\*   \*   \*   \*   \*   \*

If you find, however, that the scheme we are discussing in fact existed but that Mr. Swanton at some point affirmatively disassociated himself from it, then you may not consider against him the acts and the declarations of other participants in the scheme after that date. (Emphasis added).

Swanton claims, citing *United States v. Garguilo,* 310 F.2d 249 (2d Cir. 1962), that

the district court's charge was too general; he argues that the jury should have been instructed that Swanton's introduction of Montella to Clemente in April 1974 alone could not be the basis of liability under the *Peoni* standard and the facts of the present case. The *Garguilo* case, however, is readily distinguishable from the one at bar. In *Garguilo,* a case involving counterfeiting, the evidence against the defendant Macchia consisted solely of testimony about his "presence" at a few sessions in which the defendant Garguilo practiced his art or attempted to prepare a counterfeit plate. Because the trial court in the course of its charge never told the jurors "in plain words that mere presence and guilty knowledge on the part of Macchia would not suffice unless they were also convinced beyond a reasonable doubt that Macchia was doing something to forward the crime," *United States v. Garguilo, supra,* 310 F.2d at 254, this Court reversed and remanded the case for a new trial. Here, however, the jury was "plainly" charged that a conviction of Swanton for aiding and abetting Clemente required that they find that Swanton "sought by his action to make [the scheme] succeed with respect to each payment alleged in each count." Plainer language concerning Swanton's purposiveness could hardly have been delivered.

■ Swanton also argues that insufficient evidence to support his conviction for aiding and abetting Clemente was introduced at trial. He contends that merely introducing Montella to Clemente in April 1974, in connection with the Netumar account, could hardly serve as a sufficient factual predicate for imposing criminal liability for the payoffs to Clemente during the following four and one-half years. Moreover, Swanton claims that the fact that he did not receive any benefit from the transactions he facilitated between Clemente and Montella illustrates that he had no interest in seeing that the venture succeed. But whether a Hobbs Act defendant personally receives any benefit from his alleged extortion is largely irrelevant for the purpose of determining guilt under that

Act. *See United States v. Green,* 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494 (1956); *United States v. Cerilli,* 603 F.2d 415 (3d Cir. 1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980); *United States v. Trotta,* 525 F.2d 1096, 1098 n.2 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Provenzano,* 334 F.2d 678, 686 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). Rather, the controlling issue here is whether sufficient evidence was introduced at trial for the jury to conclude that Swanton purposively sought to make the kickback scheme succeed. This might have been a close question had the government not introduced evidence of Swanton's history of similar extortionate acts involving the same parties. Around 1970 or 1971, when Montella was employed by N. J. Export and was servicing the Netumar Line, Swanton had demanded that Montella kickback monies to him to retain the account. Thus in 1974, when Swanton contacted Montella, who at the time was employed by Quin Lumber, and instructed him to pay Clemente $500 per month to regain the Netumar account, the jury was entitled to infer that Swanton intended to create a scheme similar to the one in which he had actively participated a few years before.

## II.

### Clemente's Taft-Hartley Convictions

■ Clemente was convicted on 35 counts of aiding and abetting the receipt of money by Buzzanca, a labor official. Clemente claims that there was a variance between the crimes charged in his indictment and those for which he was convicted. Specifically, Clemente contends that while the indictment charged him with aiding and abetting the *receipt* of illegal labor payments, in violation of 29 U.S.C. § 186(b) (1976), the proof at trial demonstrated, if anything, that he aided and abetted the *making* of those illegal payments, in violation of 29 U.S.C. § 186(a) (1976). We conclude that in

light of the great quantity of proof introduced by the government concerning the key role that payoffs to union leaders played in the overall scheme of the criminal enterprise, the limited direct proof of Clemente's purposiveness in assisting Buzzanca's illegal receipt of the monies was sufficient to support Clemente's conviction on these counts.

It is clear from the record that Clemente facilitated the arrangement between Montella and Buzzanca. Montella informed Clemente in 1975 about the trouble he was experiencing in connection with his payoffs to Gardner and Colucci concerning the Concordia Line account. Clemente advised Montella that he would have to live up to the commitment he made, but that he should "go see this kid Tommy Buzzanca, tell him you are with me and tell him the story." Shortly thereafter, Clemente introduced Montella to Buzzanca at an unplanned rendezvous in Ponte's restaurant in lower Manhattan. At Ponte's, Buzzanca assured Clemente that "I'll take care of it from here," and told Montella in Clemente's presence to "see me in my office every month. Don't see them [Gardner and Colucci] anymore." Thus, the record shows that Clemente assisted both parties to the transaction.

At trial Judge Sand charged the jury that "the government contends that the defendants Clemente, Fiumara and Copolla aided and abetted the defendant Buzzanca, a labor official, to request, demand or receive payments from Mr. Montella." While the proof adduced at trial might have made a stronger case against Clemente for aiding and abetting Montella's making the payoffs as opposed to Buzzanca's receiving them, we are satisfied that the evidence is sufficient to sustain Clemente's conviction for the latter. The government correctly observes that there is no authority for the "proposition that a defendant who aids and abets both parties to an illegal transaction cannot be convicted for aiding and abetting both." All of the authorities cited by Clemente are simply inapposite.

## III.

*The RICO Counts*

■ Defendants Clemente, Fiumara, Buzzanca, Colucci, and Gardner, were convicted of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (1976), and conspiring to violate that statute, 18 U.S.C. § 1962(d) (1976). Defendant Copolla was convicted of conspiring to violate RICO. All of the defendants claim that the enterprise charged in the indictment, a "group of individuals associated in fact" having no legitimate purpose, is outside the scope of the term "enterprise" as it is employed in RICO. *See* 18 U.S.C. § 1961(4) (1976). Additionally, the defendants claim that the RICO conspiracy count against each of them is unconstitutionally vague. We reject both of these contentions. In *United States v. Altese*, 542 F.2d 104, 106 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977), we held that the term "enterprise" embraces both legitimate and illegitimate enterprises. This Court recently adhered to the position taken in *Altese* in *United States v. Errico*, 635 F.2d 152, 155 (2d Cir. 1980), and *United States v. Mannino*, 635 F.2d 110, 117 (2d Cir. 1980). Since our decisions in *Errico* and *Mannino*, in which we noted the split of authority on this issue, the Sixth Circuit reached a result in line with *Altese* in an *in banc* decision in *United States v. Sutton*, 642 F.2d 1001 (6th Cir. 1980), *rev'g United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979). Only the First and Eighth Circuits have adopted a contrary view. *See United States v. Turkette*, 632 F.2d 896 (1st Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 938, 66 L.Ed.2d —— (1981); *United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980). Although we decline this opportunity to review our position taken in *Altese*, we note in passing that the purpose of the "enterprise" here was the establishment of a pattern of racketeering activity in a legitimate business, the waterfront industry.[7]

■ Defendants claim that since the enterprise charged in the indictment, an association in fact, was itself a conspiracy, a charge that the defendants conspired to create the enterprise is unintelligible. We agree with the Fifth Circuit which squarely confronted and rejected this contention in *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980):

> We conclude that Count One of the indictment properly charged a conspiracy to conduct the affairs of a § 1961(4) enterprise through racketeering activities, the nature of which was precisely stated, and adequately informed defendants that the enterprise whose affairs they conspired to conduct was one which they, by their association, had formed. *See United States v. Hawes*, 529 F.2d 472, 479 (5th Cir. 1976). That the formation of the enterprise and the conception of the conspiracy may have occurred simultaneously in no way detracts from the Act's applicability.

603 F.2d at 545–46.

■ Finally, the defendants claim that the district court's charge to the jury concerning the RICO conspiracy counts was improper. The defendants, however, failed to object to this portion of the court's charge and thus waived any objection they may have had in this regard. Fed.R. Crim.P. 30. *See, e. g., Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *United States v. Vila*, 599 F.2d 21, 25 (2d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) (alternate holding); 8A J. Moore Federal Practice ¶ 30.04 (2d ed. 1980).

---

7. In a case strikingly similar to the one at bar that also involved waterfront corruption, the Third Circuit cogently stated:

> The purpose of RICO—prevention of infiltration of legitimate business by racketeers— would in any event be vindicated by the convictions here, since the wholly illegitimate Provenzano association subverted legitimate unions and businesses .... We decline in this case to construe the RICO statute so as to allow the appellants a defense that they made sure *not* to engage in any *legal* activity. *United States v. Provenzano*, 620 F.2d 985, 993 (3d Cir. 1980) (emphasis in original).

## IV.

### Defendant Gardner's Cross-Examination

Defendant Gardner claims that he was unfairly cross-examined and that his previous Taft-Hartley conviction was improperly admitted at trial.

Gardner testified on direct examination that he had never received any payoff money from Montella; that hundreds of thousands of dollars of loans accounted for his possession of large sums of money in the indictment years; that he received no loans as a result of his ILA position; and that his prosecution was racially motivated. On cross-examination the government sought to establish that Gardner deliberately burned his personal and business financial records shortly after receiving a subpoena for their production, and that some of his loans were received as a result of his ILA position. Gardner was questioned about having filed false loan applications, and three of these applications were admitted into evidence. Additionally, after questioning Gardner about checks he had purportedly received from waterfront employers for charitable affairs, the government established that the "charities" were frauds and that Gardner had kept the monies for himself. Finally, after Gardner denied that he had received any loans by reason of his union position, the government was permitted to prove that Gardner was convicted for receiving such a loan from a waterfront businessman in 1979.

The defendant contends that Judge Sand failed to consider the prejudicial effect of the impeachment evidence used against him pursuant to Rule 403 of the Federal Rules of Evidence.[8] We are satisfied, however, that Judge Sand did not abuse the broad discretion afforded to him under Rule 403. *See generally United States v. Benedetto*, 571 F.2d 1246, 1251 (2d Cir. 1978); *United States v. King*, 560 F.2d 122, 128 (2d Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977). The government's impeachment of Gardner fell into three general categories: (1) inquiries into conduct of the defendant that bore on his character for truthfulness, (2) extrinsic evidence of specific acts, and (3) evidence of a prior conviction. The first two categories fall within Rule 608(b)[9] of the Federal Rules of Evidence, the third within Rule 609(a).[10]

We conclude that the court did not abuse its discretion in allowing the government to inquire into the destruction of Gardner's personal and business records. *See United States v. Graham*, 102 F.2d 436, 442 (2d Cir.), *cert. denied*, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939). The evidence was indisputably relevant to and probative of Gardner's untruthfulness. Likewise, the government's inquiry into Gardner's loan

---

**8.** Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**9.** Fed.R.Evid. 608(b) provides:

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

**10.** Fed.R.Evid. 609(a) provides:

(a) General rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

transactions was entirely proper. Gardner had injected the subject into the case in his direct testimony, and the government was entitled to pursue the subject on cross-examination. *United States v. Hockridge,* 573 F.2d 752, 761 (2d Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978); *United States v. Benedetto, supra,* 571 F.2d at 1250–51. Similarly, the government's inquiries on cross-examination into Gardner's acceptance of checks from Montella and others for the purported charitable affairs were permissible to refute Gardner's direct testimony that he had never taken money for illicit reasons from Montella. We are thus satisfied that the government's inquiries on cross-examination were permissible under Rule 608(b).

■ The admission of the fraudulent loan applications, however, is another matter. Rule 608(b) explicitly provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking his credibility . . . may not be proved by extrinsic evidence." Even assuming, however, that the loan applications were improperly admitted to prove facts collateral to the charges in the indictment, in view of the substantial evidence introduced against Gardner,[11] we are convinced that any error in their admission was harmless.

■ Gardner's complaint that his prior conviction should not have been admitted under Rule 609(a) simply does not withstand analysis. The evidence of his conviction was not admitted until Gardner denied the facts underlying the conviction. Moreover, Gardner actually requested that it be admitted. The record reveals that Judge Sand bent over backwards to guard defendant Gardner from being unduly prejudiced. Following Gardner's first denial of the facts underlying his previous conviction, Judge Sand gave him another "chance" to testify truthfully before permitting the government to impeach him with evidence of the conviction.

We have carefully considered all of the defendants' other contentions and find them to be without merit. Accordingly, the judgments of conviction are affirmed.

## APPENDIX

| Defendant (Total Prison Term; Total Fine; Total Counts) | Counts | Charge | Term of Imprisonment | Fine |
|---|---|---|---|---|
| MICHAEL CLEMENTE (20 years; $50,000; 103 cts.) | 1 | RICO | 20 years | $25,000 |
| | 2 | RICO Consp. | 20 years | |
| | 49-83 | Labor payments | 6 mo. each other; conc. to Cts. 1 & 2) | |
| | 87-142 | Extortion | 20 years each | |
| | 200, 202, 204, 206 208 | Tax Evasion | 4 years each (consec. to each other; conc. to all others) | $ 5,000 each |
| | 201, 203, 205, 207, 209 | Filing False Tax Returns | 3 years each (consec. to each other; conc. to all others) | |

11. Three different employees testified that they personally paid Gardner $200,000 in illegal cash payoffs, and the testimony of three other eyewitnesses corroborated these payoffs. And finally, a tape recording in which Gardner admitted receiving the illegal cash payments was introduced.

| Defendant (Total Prison Term; Total Fine; Total Counts) | Counts | Charge | Term of Imprisonment | Fine |
|---|---|---|---|---|
| TINO FIUMARA (25 years; $10,000; 74 cts.) | 1 | RICO | 20 years | |
| | 2 | RICO Consp. | 5 years | $10,000 |
| | 14-48 | Extortion | 20 years each | |
| | 49-83 | Labor payments | 6 mo. each (consec. to each other; conc. to Ct. 1) | |
| | 210, 211 | Filing False Tax Returns | 2½ years each (consec. to each other; conc. with Ct. 2) | $ 5,000 |
| THOMAS BUZZANCA (10 years; $5,000; 73 cts.) | 1 | RICO | 10 years | $ 5,000 |
| | 2 | RICO Consp. | 10 years | |
| | 14-48 | Extortion | 10 years each | |
| | 49-83, 84 | Labor payments | 3 mo. each (consec. to each other; conc. to others) | |
| VINCENT COLUCCI (5½ years; $5,000; 12 cts.) | 1 | RICO | 5½ years | $ 5,000 |
| | 2 | RICO Consp. | 5½ years | |
| | 3-6, 13 | Extortion | 5½ years each | |
| | 8-11 | Labor Payments | 1 year each (consec. to each other; conc. to all others) | |
| | 212 | Filing False Tax Returns | 3 years | |
| CAROL GARDNER (10 years; $5,000; 13 cts.) | 1 | RICO | 10 years | |
| | 2 | RICO Consp. | 10 years | |
| | 3-6, 13 | Extortion | 10 years each | |
| | 8-11, 85 | Labor payments | 1 year (consec. to each other; conc. to all others) | |
| | 213 | Filing False Tax Returns | 3 years | |
| MICHAEL COPOLLA (13 years; 1 ct.) | 2 | RICO Consp. | 13 years | |
| GERALD SWANTON (5 years; $5,000; 60 cts.) | 87 | Extortion | 5 years | $ 5,000 |
| | 88-142 | Extortion | 5 years each | |
| | 196-199 | False Statements | 5 years each (conc. to each other) | |