**CHOCK FULL O'NUTS CORPORATION,**
**Plaintiff,**

v.

**Jerry FINKELSTEIN, James A. Finkelstein, Steven Bauman, Burton M. Abrams, ABC Industries, Inc., Norman Elowitz, Seymour Cohn, Gladieux Corporation, Lawrence E. Brinn, Robert L. Wechsler and H.J.T. Co., Inc., Defendants.**

No. 82 Civ. 6013.

United States District Court,
S. D. New York.

Oct. 6, 1982.

Allen Kezsbom, Jay Wishingrad, Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff.

Jefferey Glekel, Bradley P. Holmes, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiff in this action, filed on September 9, 1982, founded on § 13(d) of the Securities Exchange Act of 1934 (hereinafter "the Act") brings this action in its capacity as issuer of its own publicly traded common stock, against defendants, a group acting together (hereinafter "the Insurgents"), who have recently acquired approximately 16% of plaintiff's common stock in open market purchases. Plaintiff seeks injunctive relief only.

Plaintiff operates a well-known chain of fast-food restaurants in the City of New York and elsewhere, under the trade name "Chock Full O'Nuts." It is referred to herein, and in the documents submitted to the Court as "Chock Full." Defendants apparently perceived that plaintiff was also "Chock Full Of Money," undervalued assets, or unrealized potential.

Defendants duly filed a Schedule 13D Statement and six Amendments with the issuer and with the Securities and Exchange Commission ("SEC"). That portion of the statements as amended known as "Item 4—Purpose of Transaction" is set forth in that noncommittal *lingua franca* which has become customary in documents making disclosure under the federal securities laws, written with reference to forms used successfully in prior cases, intended to comply with the law and yet retain as much decision making latitude as is possible. Such verbiage often obscures as much as it discloses. The six Amendments which are now on record must be treated for purposes of this lawsuit along with the original filing, as a single disclosure statement.

Certain defendants have moved by notice of motion stated as being brought pursuant to Rule 12(b)(6), F.R.Civ.P., to dismiss the amended complaint docketed September 16, 1982, for failure to state a claim upon which relief can be granted. An affidavit containing documents and exhibits was submitted therewith and considered by the Court in connection with the motion, which

therefore must be treated as having been made for summary judgment pursuant to Rule 56, F.R.Civ.P. The motion was heard and fully submitted on September 22, 1982, together with a companion motion by plaintiff seeking expedited discovery. Because of the Court's disposition of the substantive motion noted below, the application for expedited discovery is moot.

■ When only equitable relief is sought, the Court's decree speaks as of the date on which it is uttered, and with reference to the facts then existing. *Chapman v. Sheridan-Wyoming Coal Co., Inc.,* 338 U.S. 621, 630, 70 S.Ct. 392, 397, 94 L.Ed. 393 (1950). We are therefore concerned here only with the adequacy of the disclosure in the 13D Statements, as they have been amended to date and now stand. Included now is a copy of the amended complaint in this action (Ex. 2 to Amendment to Schedule 13D Statement filed on September 13, 1982 and annexed as Ex. 7 to the Affidavit of Jeffrey Glekel, sworn to September 16, 1982). However, the amended Statement does not concede the truth of the allegations.

The gist of the amended complaint is found in the following allegations:

"18. At a time presently unknown to plaintiff, but believed to be no later than November, 1981, the defendants embarked upon a plan, scheme and conspiracy to purchase large amounts of plaintiff's common stock for the purpose of later *extorting* from plaintiff a price for those shares that is far in excess of their fair market value by threatening to conduct or by conducting a proxy contest. [Emphasis added].

\* \* \* \* \* \*

21. The Schedule 13D Statements filed by the defendants are false and misleading, contain untrue statements of material facts, and omit to state material facts necessary to make the statements contained therein not misleading in that they indicate [sic] that defendants were considering an attempt to gain control of plaintiff or to exert influence over plaintiff's management when in fact defendants' true purpose in acquiring plaintiff's shares was to later *extort* from plaintiff *a price for those shares that is far in excess of their fair market value by threatening to conduct or by conducting a proxy contest.*" [Emphasis added].

The amended complaint goes on to allege that during "discussions" following acquisition, defendants offered to sell their shares to plaintiff at a "price that is far in excess of their fair market value." (A. Complaint, ¶ 22).

The amended complaint alleges that the Schedule 13D Statements are false and misleading in that they fail "to adequately describe" the extent to which and the terms on which their purchases were financed by borrowings. This latter contention was not pressed at the hearing. The Court finds no serious defect in the nature and extent of the disclosure on this subject, which is to the effect that this deal, like so many of its kind, is floating substantially on borrowed money obtained from banks and brokerage firms. Certainly this should come as no surprise to the reasonable investor who would have occasion to study the 13D Statements for the purpose of determining his or her own course of conduct.

Plaintiff alleges substantial and irreparable injury to itself, its shareholders and others who may rely on the truthfulness of the disclosed intentions of the defendants to wage a proxy solicitation contest for corporate control. The theory is that other purchasers in the market will seize upon this information to purchase Chock Full stock of their own, in the hope of profiting from the predictable success of defendants intended corporate coup or possible improved results of new management. Alleging no adequate remedy at law, plaintiff demands the following equitable relief from the Court:

1. Preliminarily and permanently enjoining the defendants and all those acting for or in concert with them from: (a) acquiring or attempting to acquire any additional shares of plaintiff's stock; (b) voting in person or by proxy any shares of plaintiff's stock; (c) filing or disseminating any proxy materials until such

time as defendants' Schedule 13D Statements have been corrected; and (d) taking any further steps in furtherance of their unlawful plan and scheme.

2. Preliminarily and permanently ordering defendants to file corrected Schedule 13D Statements.

3. Preliminarily and permanently ordering defendants to divest themselves of all of plaintiff's shares owned by them.

4. Granting plaintiff such other and further relief as the Court may deem just and proper, including the costs and disbursements of this action.

Disclosure here is required by § 13(d) of the Act, 15 U.S.C. § 78m(d)(1)(A)–(E) (Supp. I 1977), reading in relevant part as follows:

"(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof."

We now consider exactly what was disclosed by defendants concerning the purpose of their investment. The initial Schedule 13D Statement was filed December 1, 1981 on behalf of four persons, the apparent founders of the Insurgent group. Item 4 stated in pertinent part:

*ITEM 4. Purpose of Transaction.* [Insurgents] have purchased shares of Chock Full Common Stock to acquire, as an investment, a significant minority interest in Chock Full. Depending upon the availability of shares of Chock Full Com-

mon Stock for purchase at prices acceptable to them, the availability of funds for purchases, alternative uses for funds, general economic conditions, money and stock market conditions and other factors, such persons presently intend to continue to make open market purchases of Chock Full Common Stock.

Such persons have no present plans to seek control of Chock Full either by stock ownership or otherwise, and they have no present intention to seek representation on the Board of Directors of Chock Full or to exert influence over its management, except that they do intend to exercise their voting rights on matters presented for action by shareholders of Chock Full. Such persons have no present plans to make a tender offer for shares of Chock Full, or to propose to Chock Full a merger or similar transaction. They reserve the right, however, hereafter to decide upon plans and proposals relating to any such matters.

Such persons intend to review continually their position with respect to Chock Full, and depending upon their evaluation of Chock Full's business, assets, operation, and prospects and other factors, may determine to materially increase their investment in Chock Full, or to dispose of all or any of the shares of Chock Full Common Stock now owned or hereafter to be acquired by any of them."

This non-committal disclosure was followed by Amendment No. 1, filed April 14, 1982 which told the reader that:

"Messrs. Jerry Finkelstein and James A. Finkelstein have decided to seek to arrange a meeting, in the near future, with management of Chock Full. While they have not determined any specific matters to be raised at any such meeting, they expect generally to discuss questions concerning the stability and adequacy of management and future policies to enhance Chock Full's lines of business. Subject to the outcome of any such meeting, if held, and while no specific determination as to what alternatives may be available has yet been made, the Registrants *may consider*, either alone or with others, *to engage in a solicitation of proxies to elect their nominees as directors of Chock Full.*

Subject to all of the foregoing, the Registrants further reserve the right to act in concert with any other stockholders of Chock Full for a common purpose should they determine to do so and/or to recommend courses of action to management and the stockholders of Chock Full." [Emphasis added].

The next move occurred on June 1, 1982 when Amendment No. 3 disclosed that:

"*ITEM 4. Purpose of Transaction.* As previously indicated, Messrs. Jerry Finkelstein and James A. Finkelstein sought a meeting with management of Chock Full to discuss various matters, including the stability and adequacy of management and future policies to enhance Chock Full's lines of business. The request for a meeting was made by letter, dated April 16, 1982 (annexed as Exhibit "1" and made a part hereof), which was neither acknowledged nor responded to by Chock Full. Instead, a press release dated April 26, 1982, and incorporated into a letter disseminated to stockholders (annexed as Exhibit "2" and made a part hereof), Dr. Leon Pordy, President of Chock Full indicated that the Chock Full Board of Directors at a meeting held on Friday, April 23, 1982, affirmed management's decision 'to resist vigorously any efforts by Jerry Finkelstein and the other members of his group that are inconsistent with the best interests of the company and its shareholders.'

While it has been previously indicated that no specific decision has been made among the various alternatives available to the group, the matters intended to be discussed at the desired meeting would have been of great assistance in helping the group decide upon a future course of action.

The complete failure of the Chock Full management to discuss matters deemed vital to Chock Full and its stockholders caused Mr. Jerry Finkelstein and the oth-

er members of the group to meet and discuss the entire situation with persons known to them to be acquiring shares of Chock Full Common Stock for their own account. At a meeting held on June 1, 1982, Messrs. Elowitz and Cohn agreed with the other Registrants to act in concert with them in deciding upon any future plan or proposal relating to Chock Full, including whether to seek control of Chock Full by stock ownership or otherwise, whether to seek representation on the Board of Directors of Chock Full, or whether to seek or to exert influence over its management. While no decision as to a proxy contest was made, it was determined to study and to give immediate attention to the various legal, financial, practical and other aspects relating to the possibility of a future solicitation of proxies to elect nominees of the group as Directors of Chock Full."

Apparently Chock Full management, now seeking to portray themselves as objects of an extortion attempt, did ultimately see fit to meet with their alleged tormentors. According to Amendment No. 4, filed June 26, 1982:

[All matters in brackets added].

"*ITEM 4. Purpose of Transaction.* Item 4 is hereby amended by the addition, at the end thereof, of the following:

As a result of various preliminary conversations, a meeting was arranged [between representatives of Insurgents and Management], which meeting was held on the morning of July 19, 1982. The Registrants consider all discussions at the meeting to have been only general in nature and no matters were explored in detail. No agreements or understandings were made.... Registrants inquired as to whether [two named shareholders affiliated with management] would entertain any offer to sell their shares, but based on the responses, [Registrants] concluded that there was little likelihood that they would be receptive to this overture or that any discussions would result therefrom in the reasonably foreseeable future.

At a separate meeting held in the evening of July 19, 1982, ... [w]hile no decision as to a proxy contest was made, it was determined further to study [sic] and to give immediate attention to the various legal, financial, practical and other aspects relating to the possibility of a future solicitation of proxies to elect nominees of the group as Directors of Chock Full."

Amendment No. 5, filed August 9, 1982 discloses:

"*ITEM 4. Purpose of Transaction.* Item 4 is hereby amended by the addition, at the end thereof, of the following:

On July 30, 1982, ... [w]hile no decision as to a proxy contest was made, it was determined further to study [sic] and to give immediate attention to the various legal, financial, practical and other aspects relating to the possibility of a future solicitation of proxies to elect nominees of the group as Directors of Chock Full."

The last Amendment, No. 6, filed September 13, 1982, discloses unequivocally for the first time that:

"The Registrants currently intend to conduct a proxy contest for the election of directors at Chock Full's 1982 annual meeting of shareholders.

\*    \*    \*    \*    \*    \*

Representatives of Chock Full's management and the Registrants conducted meetings during the several weeks prior to the commencement of the foregoing [lawsuits] to determine whether any basis existed for resolving differences between the parties. Among other things, ... the possibility of Chock Full purchasing the shares of Chock Full Common Stock owned by the Registrants ... were discussed. No agreements were reached in such meetings and no further meetings are planned."

So the record stands now, when equitable relief is being sought. In testing the adequacy of the disclosure now made, in the Statements as they now stand amended, the Court looks to the disclosure instru-

ments themselves and the reality of the situation. Pejorative allegations found in the complaint such as "conspiracy" and references to "extortion" or "scheme" add nothing. The purpose of the disclosure is to protect shareholders and potential investors from making uninformed investment decisions. For the amended complaint here to state a claim, the alleged non-disclosure must constitute information required to be disclosed in Schedule 13D, and must be material to a reasonable investor. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Transcon Lines v. A. G. Becker, Inc.*, 470 F.Supp. 356, 376 (S.D.N.Y.1979). Failure to disclose subjective interests of a sort obvious to the reasonable investor is not a violation of the disclosure requirements of the federal securities laws so long as the relevant underlying facts are disclosed. *Rodman v. Grant*, 608 F.2d 64, 71 (2d Cir. 1979); *Lewis v. Oppenheimer & Co.*, 481 F.Supp. 1199, 1204 (S.D.N.Y.1979). As was held in *Stedman v. Storer*, 308 F.Supp. 881, 887 (S.D.N.Y.1969):

> "[I]t is bemusing, and ultimately pointless, to charge that directors perpetrated a 'material omission' when they failed to (a) discover and adjudge faithless motives for their actions and (b) announce such a discovery in reporting the products of their managerial efforts and judgment. The securities laws, while their central insistence is indeed upon disclosure, were never intended to attempt any such measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is 'disclosed,' unless the impurities are translated into actionable deeds or omissions both objective and external."

Read fairly, the disclosures in this case clearly advise the plaintiff and the typical investor that the Insurgent group acquired its stock and holds it with the intention to pursue one or more alternative actions as follows: (1) to engage in a proxy solicitation contest with management; (2) to seek representation on the plaintiff's board of directors, either by agreement or by contested election; (3) to attempt to exert in-

fluence over plaintiff's management; and (4) to dispose of all or any of its shares by sale if it deems such a decision in its best interest.

Although defendants now say they ultimately decided as of September 13, 1982 to wage a proxy solicitation contest, the Insurgents clearly intended at all times, and intend even now, to sell their holdings at any time if a sale should appear beneficial to their interests.

This intention was disclosed adequately in the initial Schedule 13D filing on December 1, 1981, and remains in effect throughout the Amendments. Just as the unstated interest or motivation of corporate directors to maintain control of the corporation, referred to in *Rodman, supra,* was obvious to the reasonable investor, it is equally obvious here that an insurgent group setting about to conduct a proxy solicitation contest with a view of ousting the incumbent management and placing itself in control, have the equally apparent economic motive to obtain the highest possible economic benefit for themselves from their investment.

■ The securities laws are written and the securities markets are maintained, according to the concept that there is an "Economic Man," who makes investment decisions based on public information. His sole motivation is presumed to accord with Adam Smith's observation that:

> "Every individual endeavors to employ his capital so that its produce may be of greatest value. * * * He intends only his own security, only his own gain." (Wealth of Nations, 1776).

Economic Man is presumed to make investment and management decisions in order to seek the best return on his capital, consistent with safety, and is not believed to act irrationally, or merely out of some desire for ego gratification or in pursuit of power or some corrupt end. Recent events in the corporate takeover area may cast doubt on the validity of this observation. William M. Agee, President of Bendix Corporation, generally perceived as one of the losers in a recent donnybrook involving a

contest for control of Martin-Marietta Corporation is quoted as saying that a contestant for corporate control "should never overestimate the rationality of some of your foes." (N.Y. Times, October 6, 1982, p. D1). However, in evaluating disclosure, as we must here, we continue to assume rationality and that all participants approach the situation thinking as Economic Man, within Adam Smith's definition, seeking to follow the lead of Smith's "Invisible Hand."

 Market conditions, as they change from time to time; the perceived success of any ongoing proxy solicitation effort and many other relevant factors, all of which are or should be obvious to the reasonable investor, will dictate the decisions of Economic Man under any assumed circumstances, situated as these Insurgents are. It is or should be obvious to any reasonable person reading these 13D Statements, that if offered the opportunity to avoid the expense of a proxy solicitation contest and the attendant risk of failure, and at the same time enjoy substantial profits through sale of its shares to the issuer or to existing management, or to some "white knight" chosen to make the purchase, Economic Man, and indeed, any reasonably prudent person will take his profits and move on. In this Court's opinion, these 13D Statements reasonably convey the possibility that such a sale would be made, and this reality of life is so obvious that any reasonable investor reading the Statement would realize that if offered a sufficient price by the existing management of plaintiff, or by anybody, this Insurgent group, and any group, will sell.

So long as it complies with § 14 of the Act when it actually begins soliciting proxies, an insurgent group is within its rights in buying the stock of a publicly held company to oust management, in effect seeking thereby to change the identity of the thumb and fingers that milk the cow. If, to defeat that effort, management responds by purchasing the shares of the Insurgents at a price which measures the relative desires of the Insurgents to sell and the management to keep possession of the cow,

this is hardly extortion. In any event, there can be no "coercion" unless the intended victim of the coercion responds by making payment. The argument assumes that if sufficiently vexed by Insurgents threatening a proxy fight (an undertaking lawful in itself), Incumbent Management (in apparent violation of its fiduciary duty) will waste corporate assets by paying the Insurgents more than the fair market value of their stock, just to induce them to go away.

No aid of a Court of Equity is required in such a hypothetical situation; management need merely refuse to pay more than fair market value for stock offered by the alleged coercive Insurgents, and submit its side of the controversy to the shareholders who may resolve any issue by their votes at the annual meeting.

Summary judgment is granted dismissing the amended complaint for failure to state a claim upon which relief may be granted.

The Clerk shall enter final judgment. So Ordered.