**VIACOM INTERNATIONAL INC., Plaintiff,**

v.

**Carl C. ICAHN, Icahn Holding Corporation, Icahn Capital Corporation, Heron Investors Plan Inc., ACF Industries, Incorporated, Unicorn Associates Corporation, GNU Corp., Excalibur Partners, Health Investors Limited Partnership, Longview Investors Limited Partnership, Harmonious Associates Limited Partnership and Stork Associates Limited Partnership, Defendants and Third–Party Plaintiffs,**

v.

**Ralph M. BARUCH, Terrence A. Elkes, Kenneth F. Gorman, John W. Goddard, Leo Cherne, Joseph F. Condon, Theordore C. Jackson, Allan R. Johnson, Paul A. Norton, Harry M. Plotkin, Nancy C. Reynolds and John F. White, Third–Party Defendants.**

86 Civ. 4215 (RPP).

United States District Court, S.D. New York.

Sept. 14, 1990.

Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., Stephen Lowey, Wolf, Popper, Ross, Wolf & Jones, Lester L. Levy, Goodkind, Labaton & Rudoff, New York City, for plaintiff.

Weil, Gotshal & Manges, Dennis J. Block, New York City, for defendants and third-party plaintiffs.

Sherman & Sterling, Dennis P. Orr, New York City, for third-party defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is a motion by defendants for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### Background

On May 15, 1986 the defendants filed a Schedule 13D with the Securities and Exchange Commission stating that by the close of business on May 9, 1986, defendant Carl C. Icahn ("Icahn"), along with defendant corporations and partnerships which Icahn controlled, had acquired "approximately 16.95 percent" of the common stock shares of plaintiff Viacom International, Inc. ("Viacom"). In the first four months of 1986, defendants had purchased 998,200 shares of Viacom common stock (4.8 percent of shares outstanding) and within ten days of May 9, 1986, defendants purchased another 2.5 million shares of Viacom common stock, bringing Icahn's aggregate control to 3,498,200 shares of common stock. A share of Viacom common stock had a market value of $65 at the close of business on May 5, 1986 and a market value of $72 at the close of business on May 9, 1986.

Item 4 of May 15, 1986 Schedule 13D set forth the "purpose" of defendants' "obtain[ing] an equity position in the Issuer [Viacom]." Defendants stated that they had interests in using that "equity position" to pursue a variety of options: to "acquire[ ] for cash" "all of the outstanding Common Stock of the issuer"—in which context defendants "would be prepared to pay $75 per share (pre-split) for all of the Issuer's common stock"; to "enter[ ] into a standstill agreement with respect to their [defendants'] shares of Common Stock coupled with an exchange of the shares of Common Stock of the Issuer owned by the Reporting Persons [defendants] for a combination of securities of the Issuer and/or cash and a joint venture between the Issuer and an entity controlled by the Reporting Persons for the purpose of making acquisitions of companies involved in the entertainment industry"; to "continue to explore the feasibility of, and strategies for seeking control of the Issuer"; to "acquire additional shares of the Common Stock (subject to availability of shares at prices deemed favorable) from time to time in the open market, in privately negotiated transactions, by tender offer or otherwise"; or "to dispose of shares of Common Stock in the open market, in privately negotiated transactions with third parties or to the Issuer for cash or otherwise."

On May 21, 1986, Icahn, on behalf of all defendants, signed three agreements with Viacom. The first agreement, entitled "Exchange Agreement," referred to Viacom as "Company," to the 3,498,200 shares controlled by defendants as "Company Shares," and to defendants as "Seller Group" and "Warrant Group."[1] The Exchange Agreement stated:

---

**1.** The "Seller Group" consisted of defendants Icahn Holding Corporation, Icahn Capital Corporation, Heron Investors Plan Inc., ACF Industries Inc., GNU Corporation, Unicorn Associates

The Seller Group beneficially owns 3,498,200 (pre-Stock Split as defined herein) shares (the "Company Shares") of Common Shares, $1.00 par value, of the Company (the "Common Stock") and has agreed with the Company to sell the Company Shares to the Company. This Agreement sets forth the terms and conditions upon which the entities listed on Annex B (the "Warrant Group") (such entities being the direct beneficial owners of the Company shares) are selling, transferring and assigning to the Company the Company Shares in exchange for $216,888,400 in cash (or $62 per share pre-Stock Split) and warrants (the "Warrants") to purchase 2,500,000 shares of Common Stock (pre-Stock Split), issued pursuant to a Warrant Agreement dated as of May 21, 1986 between the Company and the Warrant Group (the "Warrant Agreement"), substantially in the form of Annex C attached hereto.

Def. 3(g), Ex. A.[2] The Exchange Agreement also contained a covenant which bars defendants from purchasing Viacom stock or otherwise seeking to control Viacom for a period of eleven years. *Id.*

Pursuant to the terms of the paragraph quoted above, a second agreement, entitled "Warrant Agreement," was annexed to the Exchange Agreement and set forth the terms of the issuance of warrants to defendants.

On May 21, 1986, there was also a third written agreement reached between defendants and plaintiff. The third written agreement provides for Viacom to give defendants access to commercial air time on the radio and television stations owned by plaintiff. The third agreement is referred to in a passage at the end of the Exchange Agreement: "This [Exchange] Agreement, the Warrant Agreement and an agreement with respect to advertising entered into on the date hereof, contain the entire understanding of the parties with respect to their subject matter." The third agreement (the "Advertising Agreement") is in the form of a letter agreement written to defendants from plaintiff. The Advertising Agreement states:

Reference is made to the Exchange Agreement (the "Exchange Agreement") of even date herewith wherein it was agreed that Viacom International Inc. (the "Company") would acquire from the Seller Group (as defined in the Exchange Agreement) all of the common stock now owned by you [defendants] in the Company (including common stock which you have a right to receive pursuant to a two-for-one stock split declared by the Company on May 1, 1986) in exchange for cash and certain warrants. In consideration of the covenants contained in the Exchange Agreement, the Company hereby agrees to provide the consideration described in this Agreement to you or your designated affiliates and assignees as part of the consideration for the shares of common stock of the Company being acquired by the Company pursuant to the Exchange Agreement.

The Company agrees to provide to you air time at no cost, with a Value (as defined below) of $10,000,000, on the Company's present and future communication facilities (the "Facilities")....

---

Corporation, Excalibur Partners, Health Investors Limited Partnership, Longview Investors Limited Partnership, Harmonious Associates Limited Partnership, Stork Associates Limited Partnership, and Carl C. Icahn.

The "Warrant Group" consisted of defendants Excalibur Partners, Health Investors Limited Partnership, Longview Investors Limited Partnership, Unicorn Associates Corporation, and Harmonious Associates Limited Partnership.

2. The Exchange Agreement further explained the references to the "Stock Split":

The Company declared a two-for-one stock split (the "Stock Split") to be effected in the form of a dividend by the distribution on May 26, 1986, of one share of Common Stock with respect to each share of Common Stock issued as of May 12, 1986. The terms of this Agreement shall include the shares of Common Stock to be distributed to the Warrant Group on May 26, 1986 (which shares will be transferred back to the Company pursuant to Section 1(c)) and the 5,000,000 Warrants which will be delivered to the Warrant Group pursuant to Section 1(d). All references in this Agreement to the Company Shares shall also include the shares of Common Stock issuable upon the Stock Split.

Def. 3(g), Ex. A.[3]

Defendants "accept for purposes of this motion—that [the three agreements resulted in] plaintiff pa[ying] defendants consideration equal to approximately $79.50 per share." Def. 3(g) at 2, ¶ 2. The $79.50 per share figure consists of the cash payments, the value of the warrants and the value to plaintiff of the advertising time. The actual market value of a share of Viacom common stock on May 22, 1986 was $62 per share. *See* Pl. 3(g) at 6, ¶ B(20); Def. 3(g) at 3, ¶ 3.

On May 28, 1986, plaintiff filed this suit alleging that defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. The Amended Complaint filed on October 11, 1988, alleges that defendants engaged in a pattern of racketeering activity involving violations of the Hobbs Act, 18 U.S.C. § 1951, and fraud in the sale of securities. Plaintiff claims that defendants conduct caused damages to plaintiff in the sum of $60,525,000, which is approximately the difference between the market price of 3,498,200 shares of Viacom common stock on May 21, 1986 and the alleged value of the consideration transferred by plaintiff to defendants for 3,498,200 shares of Viacom common stock on May 21, 1986.

Discovery has yet to be completed. In particular, plaintiff has yet to depose Icahn. Nevertheless, defendants move for summary judgment based on the contention that as a matter of law plaintiff's case must fail regardless of any facts that might be brought out by additional discovery.[4]

### Discussion

 To grant a motion for summary judgment a court must find that there is no genuine issue as to any material fact, and that the moving party is entitled to judg-ment as a matter of law because, after sufficient time for discovery, the non-moving party has failed to make a sufficient showing of an essential element of its case as to which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must deny summary judgment if it is found that the deposition of of Icahn or the conduct of other discovery, in which plaintiff has yet to engage, could shed light on material facts. *See* Federal Rule of Civil Procedure 56(f) (summary judgment is inappropriate "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition").

Despite the timing of this motion, defendants contend that the law and facts currently available show conclusively that plaintiff will be unable to establish two elements of its RICO claim: (1) that defendants engaged in the predicate RICO acts of violating the Hobbs Act by committing extortion and engaging in securities fraud (2) that plaintiff suffered damages. Although stating a RICO claim requires satisfaction of several other elements, those two issues are the only ones which the parties have argued on this motion and accordingly are the only ones addressed by the Court.

### I. RICO

To establish a RICO violation, plaintiff must show that defendants through a pattern of racketeering activity directly or indirectly invested in, acquired or maintained an interest in, or participated in an enterprise that affected or engaged in interstate commerce and caused injury to plaintiff thereby. 18 U.S.C. §§ 1962, 1964(c). Plaintiff alleges that defendants engaged

---

3. "Value" was defined in the Advertising Agreement as follows:

> The Value of the commercial time used will be the average rate actually charged by the specific Facility on which such commercial time is aired for air time preemptible in the manner described above for the time period or program in the month in which the commercial is run.

Def. 3(g), Ex. A.

4. Pursuant to Federal Rule of Civil Procedure 12(c), defendants' concurrent Rule 12 motion for judgment on the pleadings is incorporated into resolution of the Rule 56 motion for summary judgment.

in a racketeering activity by committing the predicate acts of securities fraud, under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and SEC Rule 10b–5 (17 C.F.R. 240.10b–5), and extortion, under the Hobbs Act (18 U.S.C. § 1951). Defendants move to dismiss plaintiff's RICO allegation on the grounds that plaintiff lacks standing to assert a Section 10b–5 claim and that the defendants' alleged conduct did not constitute a violation of the Hobbs Act.

### A. *Securities Fraud*

■ Plaintiff has alleged that defendants violated Section 10b–5 in connection with the purchase of Saxon Industries, Inc. stock and Hammermill Paper Company stock and the subsequent sale of those stocks to Saxon Industries, Inc. and Hammermill Paper Company, respectively. Plaintiff's securities fraud allegations cannot constitute predicate acts of racketeering under RICO because plaintiff was not involved in the purchase or sale of those securities and therefore lacks standing to bring the fraud claims. Plaintiff must have been directly involved in either the purchase or sale of the securities in the Rule 10b–5 allegations to have standing under RICO to assert a Rule 10b–5 violation as a predicate act of racketeering. *See International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 151–54 (4th Cir.1987); *Brannan v. Eisenstein*, 804 F.2d 1041, 1046 (8th Cir.1986); *Chief Consolidated Mining Co. v. Sunshine Mining Co.*, 725 F.Supp. 1191, 1194 (D.Utah 1989); *Silverman v. Senft*, Fed.Sec.L.Rep. (CCH) ¶ 92, 543, 1986 WL 3772 (S.D.N.Y. Mar. 27, 1986); *Kravetz v. Brukenfeld*, 591 F.Supp. 1383, 1388, 1390 (S.D.N.Y.1984).

### B. *Extortion*

The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Plaintiff takes the position that defendants obtained consideration for their shares from plaintiff with plaintiff's consent because defendants induced plaintiff "by wrongful use of ... fear."

### 1. The Framework: Wrongful Means of Achieving a Wrongful Objective

■ There are *two* elements to a Hobbs Act violation: wrongful means and wrongful objective. As the Second Circuit explains, "Extortion as defined in the Hobbs Act consists of the use of wrongful means to achieve a wrongful objective." *United States v. Clemente*, 640 F.2d 1069, 1076 (2d Cir.1981) (citing *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973)). The Supreme Court held in *Enmons* that a person employs "wrongful means" not necessarily by employing means that are illegal unto themselves, but by exploiting one of the means identified in the statute ("actual or threatened force, violence, or fear") to obtain property to which "the alleged extortionist has no lawful claim." 410 U.S. at 400, 93 S.Ct. at 1010; *Clemente*, 640 F.2d at 1076. Under the *Enmons* framework, when the objective is wrongful (i.e., to obtain property to which one "has no lawful claim"), then the means (e.g., exploitation of fear) is also wrongful. Stated another way, both elements of extortion occur whenever one exploits fear to obtain property to which one has no lawful claim.[5]

---

**5.** There is another branch of extortion caselaw which is not based upon the wrongfulness of the objective and the issue of whether the defendant has a lawful claim to the property obtained from the victim. Under *United States v. Zappola*, 677 F.2d 264, 268–70 (2d Cir.1982), if the context of the alleged extortion is outside the realm of labor disputes, then there is extortion under the Hobbs Act whenever property is obtained by "inherently wrongful means" regardless of whether or not defendant has a lawful claim to the property. *See also United v. Sturm*, 870 F.2d 769, 772–73 (1st Cir.1989); (defen-

dant's "claim of right" to property obtained from victim is only a proper defense if the means used to obtain the property were not "inherently wrongful"); *United States v. Agnes*, 753 F.2d 293, 299, 302 (3d Cir.1985) ("defendant's claim of right to the property obtained ... is irrelevant to the offense of extortion under the Hobbs Act").

Although plaintiff recognizes that this distinct branch of extortion caselaw exists, it does not argue that defendants are culpable under this

Under the *Enmons–Clemente* construction of the Hobbs Act, Viacom must show (1) that plaintiff paid the consideration to defendants because defendants were intentionally exploiting plaintiff's fear and (2) that the consideration received by defendants constituted property to which defendants had no lawful claim.

## 2. Means: Intentional Exploitation of Plaintiff's Fear

█ Whether there was fear present is resolved by examining the reasonable beliefs of the plaintiff. *See United States v. Covino*, 837 F.2d 65 (2d Cir.1988); *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (en banc). The plaintiff must show that it reasonably believed defendants had the power to harm plaintiff and that defendant would use that power to plaintiff's detriment. *Covino*, 837 F.2d at 68; *Capo*, 817 F.2d at 951. The defendants need not have caused the fear by a direct or implicit threat and the fear can be subjective as long as it is reasonable. *Covino*, 837 F.2d at 68; *Capo*, 817 F.2d at 951 (defendant need not be " 'responsible for creating that fear' " to be guilty of extortion) (quoting district court's jury charge with approval).

█ Plaintiff has come forward with deposition testimony of Viacom's officers and directors which raises an issue of fact material to whether they had a reasonable fear that if they did not purchase defendants' shares then plaintiff would continue to suffer the "preclusion or diminished opportunity for some existing or potential economic benefits." *See Covino*, 837 F.2d at 68 n. 1; *Capo*, 817 F.2d at 951. There is deposition testimony that the business operations of plaintiff were being harmed after the filing of the May 15, 1990 Schedule 13D because of public perceptions that there was an imminent threat of a takeover by defendants. Allegedly companies and individuals were refusing to engage in certain contractual relations with Viacom because of the possibility of a takeover by defendants. A jury could find that Viacom had a reasonable fear of harm to existing or potential economic opportunities as long as defendants owned the 3,498,200 shares

and were in a position to threaten a takeover.

Issues of fact also remain as to whether defendants intentionally exploited that fear in obtaining the consideration which they received in exchange for their shares. *Capo*, 817 F.2d at 951 (" 'it must be proved that the defendant intended to exploit the fear of the alleged victim' ") (quoting district court's jury charge with approval). The means by which it is alleged that defendants intentionally exploited plaintiff's fear is commonly known as "greenmail": the purchase of a block of stock, the threat of a tender offer and the acceptance of a buyout.

█ Defendants correctly point out that "greenmail" is not a means which is inherently unlawful. *See Kamerman v. Steinberg*, 891 F.2d 424, 431–32 (2d Cir. 1989) ("Tender offers are legal corporate actions"); *Dan River, Inc. v. Icahn*, 701 F.2d 278, 291 (4th Cir.1983) ("buy-me-out-or-face-a-takeover ultimatum" is not likely to be found to be securities fraud); *Chock Full O'Nuts Corp. v. Finkelstein*, 548 F.Supp. 212 (S.D.N.Y.1982) (defendants did not violate Section 13(d) of the Securities Exchange Act when they accepted a buyout offer after purchasing a block of stock and threatening a takeover). However, under the Hobbs Act, activities that are not inherently unlawful can constitute wrongful means of obtaining property. *See Clemente*, 640 F.2d at 1077–78 ("a broad spectrum of legitimate business transactions" can constitute wrongful means if used to obtain property to which no lawful claim exists); *United States v. Hyde*, 448 F.2d 815, 833 (5th Cir.1971) ("It is the wrongful use of an otherwise valid power that converts dutiful action into extortion."), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972); *Deem v. Lockheed Corp.*, 749 F.Supp. 1230 (S.D.N.Y. 1989) (client's threat to exercise "absolute right to terminate the attorney-client relationship" can constitute extortion if used as a means to obtain property to which client has no lawful claim). What converts otherwise lawful business activity into "wrong-

alternative theory. *See* Pl.Br. at 38 (March 9, 1990).

ful means" is the use of that activity to obtain property to which defendants have no lawful claim.[6]

### 3. Wrongful Objective: No Lawful Claim to Property Obtained

Even if plaintiff had a fear of economic loss which defendants intentionally exploited, there was only a Hobbs Act violation under the *Enmons-Clemente* framework if defendants received property to which they had no lawful claim.

Courts have identified two scenarios in which a defendant obtains property to which he has no lawful claim. The first is when the victim receives, in exchange for his property, something which is of no value to the victim. For instance, the *Enmons* Court explained that a labor union has no lawful claim to wages received in exchange for " 'imposed, unwanted, superfluous and fictitious services of laborers.' " 410 U.S. at 408, 93 S.Ct. at 1014 (quoting *United States v. Green*, 350 U.S. 415, 417, 76 S.Ct. 522, 524, 100 L.Ed. 494 (1956)). In *United States v. Kemble*, 198 F.2d 889 (3d Cir.1952), such a situation arose when the union used fear to induce the employer to pay wages for an additional worker to do exactly what another worker was already being paid to do.[7]

■ The second category is when the victim receives, in exchange for his proper-

6. *Kamerman, Dan River,* and *Chock Full O'Nuts* do not explicitly deal with whether "greenmail" is extortion.

The Second Circuit in *Kamerman* was confronted with a claim of duress under New York law. The Second Circuit set forth the four elements of common law duress:

(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative.

891 F.2d at 431 (citing *Gulf & Western Corp. v. Craftique Productions, Inc.*, 523 F.Supp. 603, 610 (S.D.N.Y.1981)). The court then interpreted the second element to stand for the proposition that if the threatened action was legal, then there cannot be duress under New York law. *See* 891 F.2d at 431–32 (quoting *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 593 n. 4, 446 N.Y.S.2d 917, 924 n. 4, 431 N.E.2d 278, 285 n. 4 (N.Y.1981) ("it is not duress to threaten to take action which is legally permissible")). Since "[t]ender offers are legal corporate actions," the court concluded that a buy-out resulting from a takeover threat was not caused by common law duress. As established above, the inherent legality of a means of exploiting fear does not insulate that means from constituting a wrongful means under the Hobbs Act.

The Fourth Circuit in *Dan River* denied a preliminary injunction, holding in part that a " 'buy-me-out-or-face-a-takeover' ultimatum" by defendant (who happened to be Icahn) in a Schedule 13D is likely not to be found at trial to be a "manipulative and deceptive scheme prohibited by section 10(b)." 701 F.2d at 284–85, 291. The Fourth Circuit then stated that the legality of "greenmail" under section 10(b) means that "it will not be easy to find predicate offenses [for a RICO claim] in Icahn's prior use of the ultimatum strategy—whether the theory be one of securities fraud or extortion." *Id.* at 291. However, under Second Circuit precedent the lawfulness of Icahn's activity under section 10(b) does not insulate his activity from being unlawful under a theory of extortion.

Judge (now Chief Judge) Brieant's holding in *Chock Full O'Nuts Corp.* is limited to holding that defendants adequately disclosed their intentions to engage in "greenmail" in a Schedule 13D and therefore did not violate the disclosure requirements of the Securities Exchange Act. The district court found that the text of the Schedule 13D adequately disclosed defendants' intention "to sell their holdings at any time if a sale should appear beneficial to their interests." 548 F.Supp. at 218. After making the conclusions of law on the adequacy of the disclosure based on an examination of the text of the Schedule 13D, Judge Brieant went on to note that the possibility that an insurgent, such as defendants, would sell their stock to the incumbent management who wish to avoid a takeover is a "reality of life" and "hardly extortion." 548 F.Supp. at 219. The reference to "extortion" is dictum and is not based upon any reference to the Hobbs Act or caselaw pertaining to extortion. Accordingly, the Court interprets *Chock Full O'Nuts Corp.* to stand, like *Dan River*, for the lawfulness of "greenmail" activities under the securities laws and not to be binding precedent on whether lawful greenmail activity can be wrongfully used to constitute extortion under the Hobbs Act.

7. The finding of extortion in *Deem v. Lockheed Corp., supra,* also falls into this first category. In *Deem*, the defendant corporate client used the plaintiff law firm's fear, that the client would discontinue the attorney-client relationship, to obtain the corporate opportunity—i.e., the defendant used fear to obtain "something for nothing." The defendant used fear of loss of a continuing client relationship to obtain the benefit of the finder's efforts of the plaintiff ("something") in exchange for no finder's fee ("nothing"). Nothing of objective value transferred to the plaintiff in *Deem*. Defendant used the threat of discontinuance, but did not provide plaintiff with an agreement of retainer for

ty, something which the victim values. In this category, some acts constitute extortion and others are found to be "hard-bargaining." Examples of extortion in this category are the personal payoff cases. Those cases hold that defendants had no lawful claim to the property they received from the victims in exchange for providing the victims with influence and goodwill which quelled the victims fears of harm to their economic interests. *See Enmons*, 410 U.S. at 400, 93 S.Ct. at 1009; *Covino, supra; United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *Clemente, supra; United States v. Tropiano*, 418 F.2d 1069 (2d Cir.1969). However, in other scenarios in which the alleged victim is receiving something he values in return for the property he is giving to defendant, courts find that a defendant's exploitation of an alleged victim's fear is "hard-bargaining" rather than extortion. *See United States v. Capo*, 791 F.2d 1054, 1062–63 (2d Cir.1986) (it is not extortion for a prospective employer to "bargain down the level of compensation to be paid" to "a job applicant who has long been out of work [and] may have a fear of not obtaining employment" or for "an employment agency in dealing with the applicant ... [to] require[ ] ... some sort of filing fee, service charge, or contingent fee"), rev'd on other grounds, 817 F.2d 947 (2d Cir. 1987) (en banc). A distinction is drawn between an exchange of property as a result of "hard-bargaining" and an exchange of property as a result of extortion.

The difference between "hard-bargaining" and extortion is as follows: In a "hard-bargaining" scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant. If

a victim is entitled by law to be free from the fear he is quelling by giving property to the defendant, *see Margiotta, supra* (victims had a legal right to continue their employment careers without suffering from the fears which they made payments to eliminate); *Clemente, supra; Tropiano, supra;* then the "something of value" (e.g. a guarantee not to harm the victim) the victim receives is, as a matter of law, as "imposed, unwanted, superfluous and fictitious" as the hiring of a second worker to do the job that another worker is already doing.

Here, plaintiff received something of value in return for its consideration: Plaintiff's transfer of property to defendants enabled plaintiff to receive an eleven year standstill covenant from defendants and 3,498,200 shares of common stock, thereby assuring that Viacom would be relieved of its fear of suffering damage caused by the threat of a takeover by defendants. That finding, however, does not resolve the issue of whether defendants had a lawful claim to the consideration received from plaintiff. That issue is resolved because the law did not entitle Viacom to a right to pursue its business interests free of the problems and fears caused by the threat of a takeover by defendants. Public corporations are subject to such threats on a regular basis.

At this point in history, the plaintiff does not have a pre-existing right to be free from the problems and fears of a takeover threat. *See Kamerman v. Steinberg, supra; Dan River, Inc. v. Icahn, supra; Chock Full O'Nuts Corp. v. Finkelstein, supra; see also Pin v. Texaco, Inc.*, 793 F.2d 1448, 1453 n. 8 (5th Cir.1986) (Congress has declined to adopt legislation which would restrict "greenmail" activity). Therefore, any intentional exploitation of fear by defendants was only part of "hard-bargaining" in a deal which resulted in plaintiff receiving a benefit to which it was not otherwise entitled by law. Accordingly, defendants did not obtain property from

---

a lengthy period in exchange or a finder's fee for the corporate opportunity. Plaintiff's reliance on *Deem* is misplaced, because here the

defendants provided plaintiff with a covenant and shares of stock in return for the consideration defendant received from plaintiff.

214

plaintiff to which they had no lawful claim and therefore did not commit extortion.

The additional discovery requested by plaintiff to determine the intent of defendants would not affect in any way the substantive issues on this motion. The determinative issue is not defendants' intent, but whether defendants had a lawful claim to the property they received from plaintiff. As a matter of law, defendants had a lawful claim to the property they received in exchange for a standstill covenant and their stockholdings as part of plaintiff's effort to fend off a takeover threat.

### Conclusion

Defendants' motion is granted, because plaintiff has failed to set forth a pattern of racketeering under RICO. Plaintiff lacks standing to assert its security fraud allegations as a predicate act of racketeering under RICO. There also are no genuine issues of fact material to whether defendants committed extortion, because as a matter of law the alleged conduct of defendants did not constitute extortion. The invalidity of plaintiff's predicate act allegations requires the dismissal of this RICO action. Defendants' argument that plaintiff has suffered no damages need not be reached. The Clerk of the Court is to enter an order closing the case.

IT IS SO ORDERED.