946 F.2d 998
 60 USLW 2300, Fed. Sec. L. Rep. P 96,286,
RICO Bus.Disp.Guide 7855
 VIACOM INTERNATIONAL INC., Plaintiff-Appellant,
v.
Carl C. ICAHN; Icahn Holding; Icahn Capital Corp.; Heron
Investors Plan Inc.; ACF Corporation, Inc.; Unicorn
Associates Corporation; GNU Corp.; Excaliber Partners;
Health Investors Limited Partnership; Longview Investors
Limited Partnership; Harmonious Associates Limited
Partnership; Stork Associates Limited Partnership,
Defendants - Third - Party - Plaintiffs - Appellees,
Ralph M. Baruch; Terrence A. Elkes; Kenneth F. Gorman;
John W. Goddard; Leo Cherne; Joseph F. Condon; Theodore
C. Jackson; Alan R. Johnson; Paul A. Norton; Harry M.
Plotkin; Nance C. Reynolds; John F. White,
Third-Party-Defendants-Appellees.
 No. 1534, Docket 91-7174.
 United States Court of Appeals,
Second Circuit.
 Argued May 21, 1991.
Decided Oct. 9, 1991.
 
 Michael E. Tigar, Austin, Tex. (Stephen Lowey, Neil J. Selinger, John Mage, Lowey Dannenberg Bemporad & Selinger, P.C., Goodkind, Labaton & Rudoff, Wolf Popper Ross Wolf & Jones, New York City of counsel), for plaintiff-appellant.
 Dennis J. Block, New York City (Stephen A. Radin, Beth J. Jacobwitz, New York, New York, Weil, Gotshal & Manges, of counsel), for third-party-defendants-appellees.
 Before KEARSE, MAHONEY, and SNEED,* Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Plaintiff, Viacom International Inc. (Viacom), appeals from the district court's grant of summary judgment dismissing the plaintiff's case against defendants Carl Icahn (Icahn) and various corporations and entities controlled by Icahn. Viacom claims that Icahn committed extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951 (1988), when Viacom was forced to repurchase Icahn's Viacom stock at a price that was significantly higher than current per share price on the open exchange. The district court concluded that the repurchase of the stock, commonly known as "greenmail," did not violate the Hobbs Act. We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 As of May 1, 1986, Carl Icahn held slightly less than five percent of Viacom's stock. During this time, Icahn met with Joseph R. Perella, Viacom's investment banker at First Boston Corporation. Icahn indicated that he wanted Viacom to repurchase his shares. Perella communicated this information to Viacom.
 
 
 3
 On May 5, 1986, Icahn bought one million shares of Viacom stock from Ivan Boesky for $63 a share. Because Icahn now owned more than five percent of the company's stock, he had until May 15, 1986, to file form 13D with the Securities Exchange Commission (SEC), revealing his share ownership and detailing his intentions. Before the form had to be filed, Icahn further increased his holdings when he bought 1.5 million shares of Viacom stock for $70 a share from JMB Realty Corp. of Chicago.
 
 
 4
 On May 15, 1986, Icahn filed his form 13D with the SEC. In it, he stated that he owned almost seventeen percent of Viacom's stock. He said he was prepared to buy all of Viacom's stock for $75 per share. If no deal could be reached, Icahn indicated that he would continue to explore strategies for obtaining control of Viacom. He also suggested that he might dispose of his shares for "cash or otherwise."
 
 
 5
 During this time, Icahn also went public with his share holdings. There is evidence that the widespread perception of an imminent takeover adversely affected Viacom's business operations. Apparently, companies and individuals were reluctant to engage in certain contractual relations with Viacom because of the possibility that the company would soon be sold or broken up.
 
 
 6
 On May 21, 1986, Viacom repurchased all of Icahn's shares. Icahn received cash (equivalent to $62 per share), warrants to purchase 2.5 million shares of common stock, and ten million dollars worth of free advertising.[1] When the whole deal is added together, Icahn received approximately $79.50 for each share of Viacom stock. The actual share price on the open exchange on May 22 was $62. Icahn received a premium over that market price which totalled over sixty million dollars. As part of this deal, Icahn agreed not to purchase Viacom stock or seek control of the company for eleven years. Ten months later, Viacom was acquired by National Amusement, Inc., for $111 a share.
 
 
 7
 On May 28, 1986, Viacom filed this suit alleging that Icahn and his affiliates had violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. The amended complaint filed on October 11, 1988, alleges that Icahn committed the requisite predicate acts required under RICO by engaging in extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and by committing securities fraud in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and rule 10b-5.
 
 
 8
 Specifically, Viacom alleges that Icahn's greenmail deal with Viacom constituted extortion. Viacom further alleges that Icahn has engaged in a pattern of extortion. Viacom points to other greenmail deals between Icahn and companies like B.F. Goodrich, Owens Illinois, and American Can Company. Viacom also alleges that Icahn violated the securities laws when he purchased stock in Saxon Industries (Saxon) and Hammermill Paper Company (Hammermill) and resold the stock back to the companies.
 
 
 9
 On September 14, 1990, in a published decision, Judge Robert P. Patterson granted defendants' motion for summary judgment. The court held that Icahn "did not obtain property from plaintiff to which they had no lawful claim and therefore did not commit extortion." Viacom Int'l, Inc. v. Icahn, 747 F.Supp. 205, 213-14 (S.D.N.Y.1990). The court also dismissed plaintiff's securities claims because Viacom did not have standing to raise them. Id. at 210. Having dismissed the alleged predicate acts under RICO, the court dismissed the entire case. Id. at 214.
 
 II.
 JURISDICTION AND STANDARD OF REVIEW
 
 10
 This court has jurisdiction under 28 U.S.C. § 1291 (1988). The court reviews a district court's grant of summary judgment de novo. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991). The reviewing court applies the same standard of review as that applied by the district court. See Burtnieks v. City of New York, 716 F.2d 982, 985 (2d Cir.1983). Under rule 56(c), summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Bryant, 923 F.2d at 982. We view the record and the evidence in the light most favorable to the nonmoving party. See id.
 
 III.
 DISCUSSION
 
 11
 Without addressing whether Icahn may have violated the Hobbs Act or the securities laws, we affirm the district court's holding dismissing this case because we conclude that Viacom was not damaged by the transaction. While the district court's holding was based on other grounds, both parties argued the damages question in the court below and discussed it in the briefs filed with this court. We can clearly affirm on this ground. See Colautti v. Franklin, 439 U.S. 379, 397 n. 16, 99 S.Ct. 675, 686 n. 16, 58 L.Ed.2d 596 (1979) (noting that "[a]ppellees, as the prevailing parties, may of course assert any ground in support of that judgment 'whether or not that ground was relied upon or even considered by the trial court' " (quoting Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970))); see also AVC Nederland B.V. v. Atrium Investment Partnership, 740 F.2d 148, 152 (2d Cir.1984) (same). By affirming the judgment of the district court on this ground, we are selecting what to us is the most direct route to that end.
 
 
 12
 Viacom effectively paid Icahn $79.50 for each of his three and a half million shares. At the time of the deal, the stock was trading for $62 a share on the open exchange. To determine whether Viacom was injured, we must decide whether the $79.50 Viacom paid to Icahn exceeded the fair value of the stock.
 
 
 13
 Viacom points to the open market value and argues that $62 represented the fair value of the stock. Relying on the efficient capital market hypothesis, Viacom bases its damages on the seventeen dollar premium it was forced to pay for each share of stock. The efficient capital market theory holds that "because of the large number of skilled profit-motivated investors continuously analyzing all publicly available information concerning liquid publicly traded securities, the prices of those securities in the market fairly reflects the value of the securities." Joint Appendix at A495-96. Market price is considered "the most reliable indicator of the value of [Viacom's] shares" under this theory. Id. at A496.
 
 
 14
 We do not believe that market price is the only factor to be considered when determining the value of stock in a situation such as that before us. The efficient capital market theory clearly is not the sole means of determining value. See Paramount Communications Inc. v. Time Inc., [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 94,514, at 93,277, 1989 WL 79880 (Del.Ch.Ct. July 14, 1989) (noting that the theory of a single, efficient capital market has not been given "the dignity of a sacred text" and concluding that directors, when valuating a stock buy-out, may operate on the theory that the stock market valuation is wrong). Determination of a stock's fair value is dependent on several factors. Market price is one of those factors but it is not the determining one. See Multitex Corp. of Am. v. Dickinson, 683 F.2d 1325, 1330 n. 4 (11th Cir.1982) (concluding that market price is not the sole criterion for determining the "fair value" of the stock). The court must also consider a host of other factors including net asset value and investment value. See id. at 1328-29; see also Hunter v. Mitek Indus., 721 F.Supp. 1102, 1106 (E.D.Mo.1989) (holding that the court must consider all relevant factors, including asset value, earnings, and every relevant fact and circumstance when determining the fair value of the stock).
 
 
 15
 In Litton Indus. v. Lehman Bros. Kuhn Loeb Inc., 709 F.Supp. 438 (S.D.N.Y.1989), the court said:
 
 
 16
 "[C]ourts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or could be ascertained ... and which throw any light on future prospects ... must be considered...."
 
 
 17
 Id. at 447 (quoting Tri-Continental Corp. v. Battye, 74 A.2d 71, 72 (Del.Sup.1950)). Moreover, directors may violate their fiduciary duty if they accept merger proposals based solely on market price without considering other factors that affect the company's inherent value. See Smith v. Van Gorkom, 488 A.2d 858, 875-76 (Del.1985). Finally, each case turns on its own particular facts. No specific rules can be culled from the caselaw. See Multitex, 683 F.2d at 1329.
 
 
 18
 However, it can be said that the intensity of the purchaser's desire to acquire a large block of stock reasonably may exceed its price per share in the open market. See Amsellem v. Shopwell, Inc., No. 5683, 1979 WL 2704 (Del.Ch. Sept. 6, 1979) (noting that a large block of stock may carry a higher price than the sum of its individual shares because of the control factor the block contains). A holder of such a block of stock is entitled to test the intensity of that desire by declining to sell at the price per share in the open market. So long as the parties search for that price at which the purchaser's value in use of the stock just exceeds that of the seller, the price so determined by that process does not exceed the relevant market price of that block. Unique goods sometimes fetch unique prices fairly and legitimately.
 
 
 19
 The specific facts of this case persuade us that the price Icahn was paid for his stock was arrived at in this manner and that it was worth $79.50 a share at the time Icahn sold his stock to the company. Several days before this deal was reached, Icahn had offered to buy all the company's stock at $75 a share. Viacom's directors met and reviewed two reports, which had been specially prepared by two investment firms, that evaluated Icahn's offer. The report prepared by First Boston valued Viacom's stock at $90 to $100 a share. The second report from Donaldson, Lufkin & Jenrette, Inc. valued the stock at $88 to $100 per share. Joint Appendix at A854-55. The board of directors rejected Icahn's offer as "inadequate and inappropriate." Id. at A874. Various directors testified that they believed the fair value of Viacom's stock ranged anywhere from $80 to $100. See id. at A578-79, A600-01, A620. One director acknowledged that market price was "among the least reliable indicators" of the value of Viacom's stock. Id. at 562.
 
 
 20
 Proof that these estimates were not wholly wrong consists of the fact that four months after Icahn sold his shares to Viacom, a management led group offered to purchase the company for $81 per share. After a series of bids and counteroffers, National Amusements purchased the company for $111 per share seven months later.
 
 
 21
 These facts convince us that Viacom was not injured by the transaction it entered with Icahn. The directors themselves determined that the stock was worth more than $75 per share and refused to accept an offer at that price. Pointing to their legal obligation to examine all the relevant factors, they concluded that the stock was worth at least $80 per share. Some of those same directors later offered to buy the stock for $81 per share. The company cannot now complain that it was somehow injured when it paid less for the stock than it thought it was worth. They can only show an injury by insisting that the stock can only be valued at its price per share in the open market. We have rejected this measure in this case. We are convinced that the fair value of Viacom's stock exceeded $79.50 a share and that the company was not injured when it repurchased its stock from Icahn at that price.
 
 
 22
 While we recognize that the questions are different, it is worth noting that the district court implicitly recognized that Viacom was not injured when it concluded that Icahn obtained his deal through "hard bargaining" and did not receive a benefit to which he was not otherwise entitled by law. See Viacom Int'l, 747 F.Supp. at 213.
 
 
 23
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 24
 MAHONEY, Circuit Judge, concurring in the judgment:
 
 
 25
 I agree with the majority that the judgment of the district court should be affirmed. I would not premise that affirmance, however, upon the proposition that there is no genuine issue of material fact posed by my colleagues' conclusion that "Viacom was not damaged by the transaction" with Icahn on May 21, 1986.
 
 
 26
 It is undisputed that the market price at which Viacom's common stock traded publicly on that date, when Viacom paid $79.50 per share for Icahn's holdings, was $62.00 per share. It may well be, as the majority concludes, that the real value of the stock on that date nonetheless exceeded $79.50 per share, and that the evidence marshalled by the majority in support of that conclusion should be regarded as persuasive. In my view, however, it falls short of establishing that proposition as a matter of law, which Fed.R.Civ.P. 56(c) requires for an award of summary judgment, particularly since "fairness of consideration is generally a question of fact." Klein v. Tabatchnick, 610 F.2d 1043, 1047 (2d Cir.1979) (collecting cases).
 
 
 27
 I nonetheless agree that the summary judgment granted by the district court to defendants-appellees should be affirmed, because in my view plaintiffs-appellants have established no basis for RICO liability. Plaintiffs-appellants pled two predicate acts of securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1988), and rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (1991); and a series of alleged violations of the Hobbs Act, 18 U.S.C. § 1951 (1988). Relying, inter alia, upon rulings in the Fourth and Eighth Circuits, see International Data Bank, Ltd. v. Zepkin, 812 F.2d 149, 151-54 (4th Cir.1987); Brannan v. Eisenstein, 804 F.2d 1041, 1045-46 (8th Cir.1986), the district court ruled that Viacom had no standing to assert the securities fraud claims under RICO because it was not a purchaser or seller of the securities in question. See Viacom Int'l Inc. v. Icahn, 747 F.Supp. 205, 210 (S.D.N.Y.1990). The Third, Ninth, and Eleventh Circuits take the view, on the contrary, that a RICO plaintiff has standing if "injured in his business or property by reason of" a securities fraud within the meaning of 18 U.S.C. § 1964(c) (1988), whether or not a purchaser or seller. See Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 285-86 (3d Cir.1991); Pelletier v. Zweifel, 921 F.2d 1465, 1510 n. 80 (11th Cir.1991); Securities Investor Protection Corp. v. Vigman, 908 F.2d 1461, 1465-67 (9th Cir.1990), cert. granted on this question, --- U.S. ----, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991).
 
 
 28
 In any event, the securities fraud predicates in the amended complaint herein are alleged to have been perpetrated by Icahn against two entirely unrelated companies in 1979 and 1980. Viacom was neither a purchaser or seller in those transactions, and suffered no injury to its business or property as a result of them. Further, to the extent that Viacom asserts new theories of securities fraud on appeal, I would not entertain securities fraud claims that were not properly presented below. See, e.g., In re Cooper/T. Smith (Abshire v. Gnots-Reserve, Inc.), 929 F.2d 1073, 1078 (5th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991); Schwimmer v. Sony Corp. of Am., 637 F.2d 41, 49 (2d Cir.1980); McPhail v. Municipality of Culebra, 598 F.2d 603, 607 (1st Cir.1979); Capps v. Humble Oil & Ref. Co., 536 F.2d 80, 82 (5th Cir.1976). Finally, I am in essential agreement with the district court's analysis that Viacom's allegations of Hobbs Act violations are inadequate to state a claim. See 747 F.Supp. at 210-14. I accordingly join in the judgment of affirmance.
 
 
 
 *
 Honorable Joseph T. Sneed, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation
 
 
 [1]
 The practice of forcing a company to repurchase a stockholder's stock at a premium above the current market price is commonly known as "greenmail." This is a practice commonly used by corporate raiders. They purchase a large chunk of stock and threaten to engage in a hostile takeover unless the company repurchases its shares for a premium